UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**TERESA WILLIAMS,**

Case No. 2:23-CV-00032

Plaintiff,

vs.

Hon. Hala Y. Jarbou
Mag. Judge Maarten Vermaat

**CITY OF IRON MOUNTAIN,**
**IRON MOUNTAIN POLICE DEPARTMENT,**
**ED MATTSON,** in his individual and official capacities,
**JOSEPH DUMAIS,** in his individual and official capacities,
and **GARTH BUDEK,** in his individual and official capacities,
jointly and severally,

Defendants.

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Gregory R. Grant (P68808) |
| SCHULZ GHANNAM PLLC | Kristen L. Rewa (P73043) |
| 645 Griswold St Ste 4100 | CUMMINGS, McCLOREY, DAVIS |
| Detroit, MI, 48226 | & ACHO, P.L.C. |
| (313) 788-7446 | 310 W. Front Street, Ste. 221 |
| jack@michiganworkerlaw.com | Traverse City, MI 49684 |
| *Attorneys for Plaintiff* | (231) 922-1888/(231) 922-9888 Fax |
| | ggrant@cmda-law.com |
| | krewa@cmda-law.com |
| | *Attorneys for Defendants* |

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### ***ORAL ARGUMENT REQUESTED***

NOW COMES Plaintiff Teresa Williams, by and through her attorneys,

Schulz Ghannam, PLLC, for her Response to Defendants' Motion for Summary

Judgment. For her Response, Plaintiff relies on her Brief in Support, the submitted exhibits and transcripts, as well as the facts and arguments contained within her Complaint (ECF No. 1) which has been verified through affidavit. *See **ECF No. 16-3,  PageID.185***

      **WHEREFORE**, Plaintiff respectfully request this Honorable Court deny Defendants' Motion for Summary Judgment and grant all such further relief as shall meet equity and good conscience.

                     Respectfully submitted,

                     By: /s/ Jack W. Schulz
                     Jack W. Schulz (P78078)
                     SCHULZ GHANNAM PLLC
                     645 Griswold St. Suite 4100
                     Detroit, MI 48226
                     (313) 788-7446
                     jack@michiganworkerlaw.com
                     *Attorney for Plaintiff*

Dated:      April 15, 2024

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**TERESA WILLIAMS,**

               Plaintiff,

vs.

**CITY OF IRON MOUNTAIN,**
**IRON MOUNTAIN POLICE DEPARTMENT,**
**ED MATTSON,** in his individual and official capacities,
**JOSEPH DUMAIS,** in his individual and official capacities,
and **GARTH BUDEK,** in his individual and official capacities,
jointly and severally,

               Defendants.

Case No. 2:23-CV-00032

Hon. Hala Y. Jarbou
Mag. Judge Maarten Vermaat

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Gregory R. Grant (P68808) |
| SCHULZ GHANNAM PLLC | Kristen L. Rewa (P73043) |
| 645 Griswold St Ste 4100 | CUMMINGS, McCLOREY, DAVIS |
| Detroit, MI, 48226 | & ACHO, P.L.C. |
| (313) 788-7446 | 310 W. Front Street, Ste. 221 |
| jack@michiganworkerlaw.com | Traverse City, MI 49684 |
| *Attorneys for Plaintiff* | (231) 922-1888/(231) 922-9888 Fax |
| | ggrant@cmda-law.com |
| | krewa@cmda-law.com |
| | *Attorneys for Defendants* |

_____/

## PLAINTIFF'S BRIEF IN SUPPORT OF HER RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### *\*\*\*\* ORAL ARGUMENT REQUESTED \*\*\*\**

i

# TABLE OF CONTENTS

Index of Authorities…..…………………………………………………....v

Statement of Issues Presented………………………..………………………..x

Controlling or Most Appropriate Authority…..........................................xii

Introduction……………...…………………………....…………………1

Statement of Material Facts…………………………....…………………2

Argument…..………………………………...………………...….17
.
    I.     HOSTILE WORK ENVIRONMENT CLAIMS ARE NOT BARRED AS THEY ARE PART OF THE SAME UNLAWFUL EMPLOYMENT PRACTICE…………………….………………..17

    II.    PLAINTIFF WAS DISCRIMINATED ON THE BASIS OF HER GENDER………………………………………………………18

    A. *Plaintiff suffered several adverse employment decisions*............................18

        1. Constructive Discharge………………………………………..20
        2. Prior Discipline…………………………………….......…22

    B. *Plaintiff was replaced by a man and also treated differently than similarly situated non-protected employees*....……................................23

    C. *Discriminatory remarks viewed as direct evidence of discriminatory intent……………………………………………………………..…*24

    D. *Equal Protection Act*……………………………………………24

    III.   PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED ON HER SEX……….……………...…..26

A. *Plaintiff was subjected to unwelcome harassment*........................................27

B. *Plaintiffs harassment was based on her sex*....................................................27

C. *Severe and persuasive harassment*……..……….........................................28

D. *Employer liability*…………………………………………………..30

E. *Individual Defendants are liable under ELCRA*…………………………...31

IV.     PLAINTIFF WAS RETALIATED AGAINST DUE TO HER
        PROTECTED ACTIVITY…………………….…………………………..32

A. *Plaintiff engaged I activity protected known by Defendants*………............33

B. *Defendants took adverse actions against Plaintiff*…………….....................34

    1.  Work related retaliation………………………………………………..34

    2.  Plaintiff was charged with a crime at the encouragement of
        Defendants………………………………………………………..35

    3.  Continued retaliation………………………………………………..36

C. *Causal Connection*…………………………………….……….................37

V.      PRETEXT………………………………………………………...38

    1.  No basis in fact………………………………………………………39

    2.  Plaintiff's actions did not actually motivate defendants' conduct……..39

    3.  Plaintiff's conduct was insufficient to warrant the challenged
        Conduct…………………………………………………………...40

VI.     NAMED DEFENDANTS CAN BE FOUND INDIVIDUALLY
        LIABLE UNDER BOTH EPA AND ELCRA…………………………42

VII.    IIED…….....…………………………………………………………...42

A.  *Immunity*…………….....................................................................42

        1.  Iron Mountain………………………………………………………42

        2.  Mattson……………………………………………………...44

        3.  Dumais……………………………………………………45

B.  *Plaintiff can otherwisedemonstrate Intentional Infliction of
    Emotional Distress*…....................................................................45

        1.  Matson and Dumais' conduct was extreme and outrageous…………...46

        2.  Intent or recklessness………………………………………......47

        3.  Causation and severe emotional distress………………………………47

Conclusion………………………………...…………………..………………………..47

# INDEX OF AUTHORITIES

## CASES

***Passenger Corp. v. Morgan***,
536 U.S. 101 (2002)……………………………………………..…17, 18

***McDonnell Douglas Corp. v. Green***,
411 U.S. 792 (1973)…………………………………..…………………..19

***White v. Baxter Healthcare Corp***.,
533 F.3d 381 (6th Cir. 2008)…………………………………..……………19

***Yerkes v. Ohio State Highway Patrol,***
No. 22-3030, 2022 WL 17753528 (6th Cir. Dec. 19, 2022)…………………19, 25

***Tchankpa v. Ascena Retail Grp., Inc***.,
951 F.3d 805 (6th Cir. 2020)…………………………………………..…….20

***Regan v. Faurecia Automotive Seating***, **Inc.,**
679 F.3d 475 (6th Cir. 2012)…………………………………..…………….20

***Moore v. KUKA Welding Systems & Robot Corp***.,
171 F.3d 1073 (6th Cir. 1999)……………………………………...…………..21

***Wheeler v Southland Corp.,***
875 F2d 1246 (6th Cir.1989)……………………………………………….…...22

***Thompson v. Fresh Prod., LLC,***
985 F.3d 509 (6th Cir. 2021)……………………………………………….23

***Kostic v. United Parcel Serv., Inc.,***
532 F. Supp. 3d 513 (M.D. Tenn. 2021)…………………………………..24

***Deleon v. Kalamazoo Cnty. Rd. Comm'n***,
739 F.3d 914 (6th Cir. 2014)……………………………..………………24

***City of Canton, Ohio v. Harris***,
489 U.S. 378 (1989)……………………………………………….……..25

*Nathan v. Great Lakes Water Auth.*,
992 F.3d 557 (6th Cir. 2021)……………………………………...………26

*Garcia v. Beaumont Health Royal Oak Hosp.*,
No. 22-1186, 2022 WL 5434558 (6th Cir. Oct. 7, 2022)…………………………26

*Gordon v. England*,
612 F. App'x 330 (6th Cir. 2015)……………………………………………26, 27

*Ojemudia v. Rite Aid Services, L.L.C.*,
540 F. Supp. 2d 855 (E.D. Mich. 2008)……………………………...………27

*Meritor Savings Bank, FSB v. Vinson*,
477 U.S. 57 (1986)…………………………………………………………27, 28

*Smith v. Rock-Tenn Servs., Inc.*,
813 F.3d 298 (6th Cir. 2016)………………………………………….…..28

*Hunter v. Gen. Motors, LLC*,
807 F. App'x 540 (6th Cir. 2020)……………………………………………28

*Steward v. New Chrysler*,
415 Fed. Appx. 632 (6th Cir. 2011)…………………………………………....28

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993)……………………………………………..………..28, 29

*Williams v. Gen. Motors Corp.*,
187 F.3d 553 (6th Cir. 1999)…………………………………….………..29

*Ault v. Oberlin Coll.*,
620 Fed.Appx. 395 (6th Cir. 2015)…………………………….………29

*Hawkins v. Anheuser–Busch, Inc.*,
517 F.3d 321 (6th Cir.2008)………………………………..………………..29

*Waldo v. Consumers Energy Co.*,
726 F.3d 802 (6th Cir. 2013)……………………………….………………29

*Doe v. Matthew 25, Inc*.,
322 F. Supp. 3d 843 (M.D. Tenn. 2018)………………………………………..30

*Wyatt v. Nissan North America, Inc.,*
999 F.3d 400 (6th Cir. 2021)…………………………………………...…………..30

*Elezovic v. Ford Motor Co*.,
697 N.W.2d 851 (Mich. 2005)……………………………………………..30, 31

*Elezovic v. Bennett*,
731 N.W.2d 452 (Mich. Ct. App. 2007)………………….……………………..31

*Kirkland v. City of Maryville*,
54 F.4th 901 (6th Cir. 2022)………………………………………………………32

*EEOC v. Avery Dennison Corp.,*
104 F.3d 858 (6th Cir. 1997)………………………………..………………….32

*Faragher v. City of Boca Raton*,
524 U.S. 775, 780 (1998)……………………………...………………32

*Vance v. Ball State Univ.,*
570 U.S. 421, 424 (2013)…………………………………………………………32

*Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc*.,
495 Fed.Appx. 651, 655 (6th Cir.2012)……………………….………………..33

*Johnson v. Univ. of Cincinnati*,
215 F.3d 561, 579 (6th Cir. 2000)……………………………………………..33

*EEOC v. New Breed Logistics*,
783 F.3d 1057, 1067 (6th Cir. 2015)…………………………..………….33

*Hubbell v. FedEx SmartPost, Inc*.,
933 F.3d 558, 569 (6th Cir. 2019)……………………..………………………34

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006)…….…………………………………………………35

***Robinson v. Shell Oil Co.,***
519 U.S. 337, 339 (1997)…………………………………………..………….36

***EEOC v. Ohio Edison Co.,***
7 F.3d 541, 544 (6th Cir. 1993)…………………………….…………….36

***George v. Youngstown State Univ.,***
966 F.3d 446, 460 (6th Cir. 2020)……………………………….………..37

***Randolph v. Ohio Dep't of Youth Servs.,***
453 F.3d 724, 737 (6th Cir. 2006)…………………………...………………37

***Montell v. Diversified Clinical Services, Inc.,***
757 F.3d 497, 508 (6th Cir. 2014)…………………………………....38, 39

***Zambetti v. Cuyahoga Community College,***
314 F.3d 249, 258 (6th Cir. 2002)…………………………………..…….39

***Sutherland v. Michigan Dep't of Treasury,***
344 F.3d 603, 615 (6th Cir. 2003)…………………………...………………39

***Reeves v. Sanderson Plumbing Products, Inc.,***
520 U.S. 133, 147 (2000)…………………………………………..………..39

***Pickens v. MetalTek Int'l, Inc.,***
No. 15-2429, 2018 WL 6567794, at *5 (N.D. Ohio Dec. 13, 2018)…………...…39

***Myers v. U.S. Cellular Corp.,***
257 F. App'x 947, 954 (6th Cir. 2007)……………………………………40

***Everett v. Saginaw County,***
123 Mich.App. 411 (1983)……………………………………………..43

***Fluellen v. U.S. Dept. of Justice Drug Enforcement Admin.,***
816 F.Supp. 1206 (E.D.Mich.1993)…………………………………………43

***Kreipke v. Wayne State Univ.,***
807 F.3d 768, 783-784 (6th Cir. 2015)………………………………………..44

*Courser v. Michigan House of Representatives,*
404 F.Supp.3d 1125 (W.D.Mich.2019)………………………………………44

*Odom v. Wayne Cnty.,*
760 N.W.2d 217, 218 (2008)……………………………………………44, 45

*Pratt v. Brown Mach. Co.,*
855 F.2d 1225, 1238–39 (6th Cir.1988)……………………….……………45

*Lucas v. Awaad,*
299 Mich.App. 345, 830 N.W.2d 141, 150 (2013)………………………...……45

*Hayley v. Allstate Ins. Co.,*
686 N.W.2d 273, 276 (Mich. Ct. App. 2004)…………………………………..46

*Margita v. Diamond Mortgage Corp.,*
406 N.W.2d 268, 272 (1987)………………………………………….……..46

*Doe v. Mills,*
536 N.W.2d 824, 834 (Mich. Ct. App. 1995)………………………...…………...46

*Haverbush v Powelson,*
217 Mich App 228, 235 (1996)……………………………………………...…….47

## STATEMENT OF ISSUES PRESENTED

1.    Should Plaintiff hostile work environment claims be barred when they are part of the same unlawful employment action?

    Plaintiff's Answer: No
    Defendant's Answer: Yes

2.    Has Plaintiff presented sufficient evidence to so that a jury could reasonably determine that she was discriminated against due to her gender under Title VII?

    Plaintiff's Answer: Yes
    Defendant's Answer: No

3.    Has Plaintiff presented sufficient evidence to so that she was constructively discharged?

    Plaintiff's Answer: Yes
    Defendant's Answer: No

4.    Has Plaintiff presented sufficient evidence to so that a jury could reasonably determine that she was discriminated against due to her gender in violation of ELCRA?

    Plaintiff's Answer: Yes
    Defendant's Answer: No

5.    Has Plaintiff presented sufficient evidence to so that a jury could reasonably determine that she was discriminated against due to her gender in violation of the Equal Protection Act?

    Plaintiff's Answer: Yes
    Defendant's Answer: No

6.    Has Plaintiff presented sufficient evidence to so that a jury could reasonably determine that Plaintiff was subjected to a hostile work environment based on her sex and/or sexual harassment?

Plaintiff's Answer: Yes
Defendant's Answer: No

7.      Has Plaintiff presented sufficient evidence to so that a jury could reasonably determine that the individually named Defendants, Mattson, Dumais, and Budek, could be found liable for violations under ELCRA?

Plaintiff's Answer: Yes
Defendant's Answer: No

8.      Has Plaintiff presented sufficient evidence that a jury could reasonably determine that the reasons presented by Defendants for her disciplinary actions are pretextual?

Plaintiff's Answer: Yes
Defendant's Answer: No

9.      Has Plaintiff presented sufficient evidence that a jury could reasonably determine that Defendants are not immune from liability for Intentional Infliction of Emotional Distress against Plaintiff?

Plaintiff's Answer: Yes
Defendant's Answer: No

10.    Has Plaintiff presented sufficient evidence that a jury could reasonably determine that Defendants are liable for the Intentional Infliction of Emotional Distress against Plaintiff?

Plaintiff's Answer: Yes
Defendant's Answer: No

.

## CONTROLLING AUTHORITIES PER LOCAL RULE 7.1

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)

*Moore v. KUKA Welding Systems & Robot Corp*., 171 F.3d 1073 (6th Cir. 1999)

*Wheeler v Southland Corp.,*  875 F2d 1246 (6th Cir.1989)

*Thompson v. Fresh Prod., LLC,* 985 F.3d 509 (6th Cir. 2021)

*Gordon v. England*, 612 F. App'x 330, 335 (6th Cir. 2015)

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)

*Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016)

*Hubbell v. FedEx SmartPost, Inc*., 933 F.3d 558, 569 (6th Cir. 2019)

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)

*George v. Youngstown State Univ.,* 966 F.3d 446, 460 (6th Cir. 2020)

*Montell v. Diversified Clinical Services, Inc*., 757 F.3d 497, 508 (6th Cir. 2014).

*Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)

*Everett v. Saginaw County*, 123 Mich.App. 411, 414 (1983)

## INTRODUCTION

On March 9, 2022, Teresa Williams was brought into an unexpected meeting with the leadership of IMPD, Mattson and Dumais, who notified her that the superior officer who had previously sexually assaulted her was "coming clean" to his wife. They didn't ask her any questions about what happened; they simply implored her to confirm she would put it in the past for their own protection. Teresa was shocked and sickened. She had largely suppressed the horrific ordeal, being terrified of retaliation as Mattson, Dumais, and Budek were close friends. The incident involved a bet between Dumais and Budek as to who would sleep with her first. Both Dumais and Budek had assaulted Plaintiff, but Budek "won" the bet. Plaintiff responded that she would be consulting an attorney. Within a few weeks, she was forced out forever through tainted charges against her set up and influenced by Mattson and Dumais.

Everything was equally shocking as it was unsurprising to Teresa, having been subjected to years of unequal treatment, retaliation, and abuse from the Defendants. Plaintiff had previously complained of unequal treatment, but was disciplined or retaliated against in other ways. The situation was, and remains, terrifying for Teresa. Iron Mountain is a small town with a population of 7,500 and the surrounding towns are even smaller. As a result, everyone knows each other and the Defendants have absolute power.

1

# STATEMENT OF MATERIAL FACTS[1]

Teresa Williams ("Plaintiff") had dreamed of being a police officer since the second grade. *Exhibit 7* Plaintiff knew it would be a male dominated career, but she was used to dealing with being the only woman, dating back to when she was the only girl on her high school football team. *Exhibits 7, 8* Plaintiff graduated from the police academy in 2016. *Williams 19, 21* Plaintiff initially worked for the Marquette County and Dickinson County Sheriff's Departments ("DCSD"). *Williams 24-25* Prior to leaving DCSD, Plaintiff's supervisor told her "if she stuck by Dumais and Budek, she would have a long successful career at IMPD," which she perceived meant that both held a lot of power. *Williams 92-93*

In the application process with the Iron Mountain Police Department ("IMPD"), Defendants were required to hire Plaintiff as she had the highest combined score, due to her high civil service exam score. *Mattson 61-64; Exhibit 7* Plaintiff scored lower on the *interview* than the male applicant. *Mattson 63-64*

 Plaintiff was hired by IMPD as a road patrol officer in October 2017. *Williams 47, 69* Plaintiff is the only female officer in IMPD history. *Mattson 20; Exhibit 9* The top officer of IMPD is Director Ed Mattson ("Mattson"), who has the

---

[1]Defendants' deposition of Plaintiff exercised a "see no evil hear no evil" tactic in avoiding questioning about material portions of her claim and scheduling the court reporter for a limited window preventing direct questioning by Plaintiff counsel. *Williams 196-197* For this reason, testimony is provided through affidavit and the verified complaint. *See ECF No. 16-3,  PageID.185.*

authority to discipline officers. *Mattson 12* The City Manager, Jordan Stanchina ("Stanchina"), also has the disciplinary authority, but never has. *Mattson 13* Defendant Dumais was a Lieutenant, then IMPD's Deputy Director in 2019. *Exhibit 10* Garth Budek ("Budek") was a senior officer, then Sergeant. *Exhibit 10* Budek began having a supervisory role over Plaintiff in January 2019 and Dumais always had one. *Exhibit ZE* According to Mattson, Dumais doesn't do much without running it by him and they work "hand in hand." *Mattson 80* Likewise, Budek is Dumais' "right hand man." *Hellman 55; Exhibit 7* Mattson, Dumais, and Budek are fishing and drinking buddies. *Mattson 78* Whereas, Dumais and Budek are close friends. *Budek 36; Dumais 150-151* Budek trained Plaintiff, in part, and was her partner early on. *Budek 49-51*

### IMPD Shot and Sexual Harassment[2]

As the only woman, Plaintiff tried hard to hit in with her colleagues. *Exhibit 7* Therefore, Plaintiff initially socialized with Dumais and Budek, occasionally at

---

[2]No Defendant produced any text messages prior to 2020. Dumais and Budek don't remember deleting text, but they're not there. *Dumais 22-23; Budek 12-13* Dumais produced no texts with Mattson or Budek, despite Mattson providing several texts between them. *Exhibit 12* Dumais initially testified that he never deleted texts, but they were no longer on there despite having the same phone for five years. *Dumais 17-18* Later Dumais stated he maybe deleted them because his memory gets full. *Dumais 127* Notably, Budek provided several texts to his attorneys *months* but were only provided after being identified by Hellman the day before. *Budek 16; Hellman 119; Exhibit 13*

bars. ***Budek 51; Dumais 81*** Plaintiff would later learn that the two had a bet as to who would have sex with her first. ***Williams 166***

Within her first two months of employment, Plaintiff was at the bar with Dumais, Budek and Andy Flamino, when she was told by Dumais that she was *required* to do an "IMPD Shot[3]" to be initiated into IMPD, meaning two individuals drink shots of "fireball" and then kiss each other and exchange the alcohol. ***Williams 140-144*** Plaintiff refused, but Dumais was insistent stating that she had to do it to be part of the crew[4]. ***Williams 143-144*** Plaintiff eventually gave in to the pressure from her supervisor. ***Williams 143-144*** Later that night, Dumais pressured Plaintiff into another IMPD Shot, this time grabbing her crotch as they took it. ***Williams 143-147*** Plaintiff froze and was too afraid to report the events to Mattson because she thought she would get in trouble. ***Williams 143, 149*** No other officer was subjected to similar hazing. ***Budek 42; Hellman 37-38; Benjamin 26-***

---

[3]Every officer testified their knowledge of an IMPD Shot, but each claim they've never heard or witnessed another IMPD officer taking one or mention them. ***Dumais 59, 68; Budek 38-40; Hellman 31-32; Benjamin 25-26*** Dumais did "a few of them back in the day and that it was "a common way to take a shot." ***Dumais 59-62*** Budek took one a female employee of Dickinson county. ***Budek 38-39*** Never done one with a man. ***Dumais 62*** Hellman denied doing one, but Benjamin testified that Hellman told him about doing one with a female employee of DCSD. ***Benjamin 26***

[4]In a separate incident, a former female IMPD transcriptionist swore that she was also forced to take a IMPD shot with Dumais. ***Exhibit 14*** Plaintiff was also told another female IMPD dispatcher, Carly Shoquist had taken an IMPD shot with Dumais. ***Williams 14***

*28* Dumais also intentionally "brushed" against Plaintiff's butt, throughout Plaintiff's employment with IMPD. *Exhibit 7*

During this initial period, Plaintiff was also *routinely* sexually assaulted by Budek. Budek also made sexual comments and groped Plaintiff on duty, including commenting about "how hot" Teresa looked in her uniform and touching her butt or thigh. *Williams 152; Budek 53-54, 57* One night, Plaintiff drove Dumais and Budek home from the bar, after dropping off Dumais, Budek groped and kissed Plaintiff while she was driving. *Williams 150-151; Budek 55-56 ("consensual")* Budek said it was "difficult to work with [Plaintiff]" because he found it hard to restrain himself, began rubbing Plaintiff's thigh, and said, "how are we going to resolve this issue?" *Williams 150; ECF No. 1,  PageID.8* Budek grabbed Plaintiff's head with both his hands in attempt to force her to kiss him. Plaintiff resisted. *Id.* Plaintiff did not report the incident for fear of trouble. *Williams 151* Plaintiff did not reciprocate the comments or groping. *Williams 152*  In another incident, Budek told Plaintiff he "needed to tell her something" then put her car in park at a stop sign then assaulted her, forcing her hand down his pants. *ECF No. 1, PageID.7*

On or around March 15, 2018, Budek invited Plaintiff out for drinks with his wife ("Courtney"), then to his house after to watch a movie. *Williams 154-157; Budek 62, 66* Courtney eventually excused herself, at which point Budek told

Plaintiff he had something to show her in the basement. *Williams 156-157* Budek then pushed Plaintiff down by her shoulders, pulled his pants down, and forced her to perform oral sex. *Williams 157-159* After, Budek asked Plaintiff if she was "ok" then told her not to tell anyone about what happened. *Williams 161* Budek was her senior officer at the time. *Dumais 152*

After raping Plaintiff, Budek never socialized with Plaintiff outside of work again and ceased flirting. *Budek 71-72* Around a week later, an incident occurred in which Budek screamed and belittled Plaintiff, calling her "a real f*cking cunt." *Williams 164* Plaintiff responded calling him "a real a*shole" with tears in her eyes. *Williams 164* Following the incident, Dumais met with them, told them to apologize, without asking questions. *ECF No. 1,  PageID.9* Mattson was aware of the meeting. *Mattson 83* Officer Benjamin Hellman ("Hellman") heard about the argument directly from Budek and claims it was openly discussed between officers. *Hellman 49-50*

On April 29, 2018, Mattson issued a schedule change separating Plaintiff and Budek. *Exhibit 15; Dumais 94* According to Dumais, he informed Mattson that Budek "would have a difficult time" working with Plaintiff. *Dumais 94* Both Mattson and Dumais unreasonably deny knowledge of the history of Budek and Plaintiff, yet they were never scheduled together again from that point forward. *Budek 77-78; Dumais 96* Importantly, another employee, Ashley Weslin

6

("Weslin"), submitted a sworn affidavit that she questioned Mattson about the shift change and was told it was because Budek's wife wouldn't allow him to work with Plaintiff anymore[5]. **Exhibit 14** According to Weslin, there was a known rumor that Budek's wife found out that Plaintiff at Budek's house. **Exhibit 14** Following the schedule change, Plaintiff became partnered with Hellman. **Hellman 48** Shortly after the schedule change, Plaintiff was told by Hellman there was a bet between Budek and Dumais as to who would sleep with her first[6]. **Williams 166-167**

### Facebook Post and Retaliation

According to Hellman, it was common for Plaintiff to say she felt like an outsider at IMPD. **Hellman 54** On January 15, 2019, Plaintiff posted on Facebook that she was receiving unequal treatment due to her gender, as a cry for help for which she was scolded and disciplined for by Mattson and Dumais. **Exhibit 16; Mattson 91-92** Plaintiff was referring to her time at IMPD. **Exhibit 7** The post was discussed by officers, specifically that Plaintiff was upset with her place in the IMPD and discrimination. **Hellman 57** Likewise, Budek remembered discussion that the post was "bashing IMPD." **Budek 83**

---

[5]Mattson acknowledges meeting with Ashley Weslin but "remembers it differently." **Mattson 85-87**
[6]Hellman denies telling Plaintiff this. However, Hellman also denied: (1) knowledge of Budek's infidelities, despite Benjamin testifying **Benjamin 61-62**; and (2) ever taking an IMPD shot despite Benjamin testifying that Hellman told him he had. **Benjamin 26** Notably, Benjamin testified that Plaintiff told him about the existence of "the bet" during their time as partners. **Benjamin 37-38**

In March 2019, Dumais was promoted to IMPD's Deputy Director and Budek was promoted to Sergeant. ***Exhibit 10*** From this point forward, Plaintiff's work was scrutinized and she was routinely written up. Teresa believes she was relentlessly targeted for discipline due to her gender. ***Williams 168***

In August 2019, UP Human Trafficking Task Force ("UPHT") President Stephanie Kreiger ("Kreiger") contacted Mattson requesting that Plaintiff work as a "decoy" for human trafficking stings, to which Mattson outright rejected stating "women officers don't belong up here." ***Exhibit 17*** Krieger had never heard a ranking officer make such a blatant sexist comment in her life. ***Exhibit 17***

## Dumais and Mattson intentional treatment seeking for Plaintiff to resign or be terminated

January 2020, Plaintiff informed Mattson that she heard that Dumais had told someone that Plaintiff "is not going to be around much longer." ***Mattson 101*** Mattson dismissed Plaintiff's concerns and said was probably "bar talk." ***ECF No. 1,  PageID.11***.

The majority of the bias discipline will be addressed within the pretext section later herein; however, the following is relevant to her story. On October 27, 2020, Dumais requested Plaintiff meet him behind closed. ***Williams 182*** Plaintiff vocalized that she did not feel comfortable having the door closed. ***ECF No. 1,  PageID.12.*** Dumais berated her. ***Id.*** Following the incident, Plaintiff began to document her treatment and record conversations. ***Plaintiff 134***

8

On November 10, 2020, Plaintiff received her first suspension, allegedly due to her "slow rolling" to a call to which Plaintiff disputed and said traffic was heavy. ***ECF No. 64-18,  PageID.948; Mattson 104, 106-107***. It was Mattson's expectation that Plaintiff should have exceeded the speed limit to a call involving a homeless man suspiciously looking through windows. ***Mattson 107; ECF No. 64-18, PageID.949*** The suspension was due to the alleged "insubordination" relating to Plaintiff not feeling comfortable meeting with Dumais with the door closed. ***Mattson 108-109*** Plaintiff was afraid to meet with Dumais and Mattson alone. ***Williams 125*** The following day, Mattson sent a letter to every officer, except Plaintiff, notifying them that Plaintiff was being moved to the bottom of chain of command—despite having seniority over nearly everyone. ***Exhibit 18; Hellman 62-63*** This has never been done with another officer. ***Mattson 113-114; Hellman 65-66*** Notably, Plaintiff's additional disciplines will largely be discussed within the section on pretext.

In late April 2021, Mattson joked that nobody told City Manager Stanchina that Plaintiff "was marrying a meth head," with laughing emojis. ***Exhibit 19*** Dumais replied "That's awesome," also with laughing emojis.[7] ***Exhibit 19*** Plaintiff married Jake Williams on May 8, 2021. ***Williams 17*** Following the wedding, Defendants

---

[7]Both absurdly testified that the messages were not meant to say anything was funny or awesome. ***Dumais 114-115*** Further, Jake Williams has never been convicted of any drug related crimes. ***Mattson 126; Exhibit 7***

began to keep tabs on Jake Williams. On June 14, 2021, if not earlier, Mattson and Dumais, began routine contact with the Florence County Sheriff's Department ("FCSD") inquiring if they were planning on charging Jake Williams with various crimes. *Exhibit 20; Mattson 130-131* IMPD and FCSD work jointly on several things. *Mattson 173* Budek has worked directly with TJ Peterson. *Budek 47-48*

December 10, 2021, Dumais told Plaintiff it's been a year since her problems and to keep up the good work. *Exhibit 20* Mattson acknowledged this to be true. *Mattson 122*

Around this time, Mattson was told by Sgt. Mike Weslin that Plaintiff may plot a civil action if she is fired, or "burn the place down. *Mattson 51, 137-138*

**Events Leading up to the March 9, 2022, Meeting/Budek "Coming clean"**

Budek claims he first told Dumais about his "consensual" sexual relationship with Plaintiff on February 14, 2022, then Dumais notified Mattson. *ECF No. 64-1, PageID.601-602* According to Budek, he "may" have told Mattson about the oral sex. *Budek 71* Plaintiff entirely disputes that Dumais and Mattson were previously unaware of the sexual activity. *Exhibit 7* For example, Hellman knew about the bet. *Williams 166-167.* Further, Mattson told Weslin the (permanent) removal of Budek and Plaintiff as partners was due to Budek's wife not allowing him to work with Plaintiff anymore. *Exhibit 14*

Nonetheless, Mattson already believed Plaintiff was building a case against them and Courtney doing something inappropriate "could give ammunition to Teresa for retaliation" at the time. *Mattson 137-138* For this reason, Mattson texted Dumais his concerns that Budek's wife saying something to Plaintiff which would "play into Teresa's hand." *Exhibit 12*

Plaintiff was not presented a last chance agreement  until *after* these events on February 22, 2022. *ECF No. 65-5,  PageID.977* On February 18, Mattson texted Dumais about the last chance agreement, to which Dumais responded "if [Plaintiff] takes it, I doubt she will last long." *Exhibit 12* Mattson responded that Hal Telling (the union representative)[8] said he hopes Plaintiff starts job hunting and won't last long. *Exhibit 12* Mattson stated he'd be pleased if Hal would communicate that. *Exhibit 12* The last chance was a formality as they were already confident that they could get rid of Plaintiff one way or another.

On March 4, Dumais texted about how he was "pissed" about Plaintiff telling the union she was afraid to talk to him, to which Mattson reiterated that "she will not last long do you know that." *Exhibit 12* Mattson commented that Plaintiff was crying during the conversation, to which Dumais responded "she will be in the fetal position when I'm done with her." (both posted laughing emojis) *Exhibit 12*

---

[8] Telling has since passed away. *Mattson 163* As such, his statements are an exception to hearsay under FRE 804(a)(4).

<u>**March 9, 2022, meeting with Plaintiff**</u>

On March 9, 2022, Mattson and Dumais confronted Plaintiff about previous "consensual" relationship with Budek. ***Exhibit D; ECF No. 66-4,  PageID.1070*** Mattson acknowledged inappropriate actions on duty by Budek, but dismissed off duty activity as irrelevant. ***ECF No. 66-4,  PageID.1074;*** Plaintiff responded that the timing and characterization was "f*cked up." During the meeting, Plaintiff pointed out that Budek was her senior officer. ***Id.*** Mattson said Budek mentioned inappropriate touching and "alluded" that there was more off duty." ***ECF No. 66-4, PageID.1074, 1076*** Mattson said he didn't care what happened outside of the building. ***Id.*** Plaintiff said she has previously told them she is treated like an outsider. ***ECF No. 66-4,  PageID.1077*** Mattson lied and said he knew about the blow up but didn't know any details. ***Id.*** Plaintiff stated she was "scared sh*tless" to talk to them and she doesn't expect them to understand. ***ECF No. 66-4,  PageID.1075*** The meeting concluded with Mattson asking Plaintiff what she wanted done. ***ECF No. 66-4,  PageID.1079*** Allegedly, the purpose of the meeting was to get Plaintiff's side of the things, but they didn't ask her a single question about what happened—only if she was willing to move past it. ***Dumais 156-157; ECF No. 66-4,  PageID.1070-1088***

The following morning, Plaintiff notified Dumais that she didn't feel comfortable responding without consulting her attorney. ***ECF No.  66-5,***

***PageID.1090*** Benjamin accompanied Plaintiff because she was afraid to be with Dumais alone. ***Benjamin 60*** Dumais quipped about the attorney being for the "civil end of whatever[9]" then responded that he would "run it by [Mattson] to make a determination." ***ECF No. 66-5,  PageID.1090*** Dumais notified Mattson Plaintiff was meeting with an attorney. ***Mattson 145-146*** Notably, Mattson never investigated Plaintiff's claims, including the sexual harassment. ***Mattson 26***

On April 7, 2022, Dumais texted that he received a text from FCSD officer TJ Peterson, that they would not be charging Plaintiff's husband with a crime.[10] ***Exhibit 12; Mattson 151*** Notably, the lone preserved text (which Dumais copied, pasted, and sent to Mattson) was communicated using exclamation point, relating to how they can't run specific tests because it's too expensive. ***Exhibit 12*** Later that day, Mattson and Dumais were notified that Plaintiff was to be honored for her work by the Dickinson County Prosecutor's Office. ***Exhibit 21; Mattson 149***  Neither even informed Plaintiff. ***Mattson 149-150; Dumais 162-163***

### Arrest and constructive discharge

One week later, on April 14, 2022, Jake Williams was subject to a traffic stop and investigated for allegedly driving while intoxicated in neighboring Spread

---

[9]This phrase is not in the transcript but is clearly audible on the recording at 1:22. ***See Defendants Exhibit ZZ***

[10] Importantly, Dumais did not retain any of his texts with Forrest County officers during this crucial time period, denies deleting them, but can't explain where they went. ***Dumais 18-21; 163-164***

Eagle, WI, by the FCSD[11]. *ECF No. 1,    PageID.16* Spread Eagle, WI is less than ten miles from the IMPD station. *Dumais 174* During the stop, Jake Williams called Plaintiff on speaker phone to let her know he would be late home due to the stop. *Id.* Jake Williams was asked to complete field sobriety tests, and Plaintiff stated that she would be on her way. *Id.* During the test, the FSCD officers hung up the phone on Plaintiff. *ECF No. 1,    PageID.17* Upon arriving at the scene, Plaintiff observed Mr. Williams secured in the FCSD squad car. Plaintiff asked what he was being charged with and was told an OWI. *Id.* Plaintiff also observed that the officers extensively searched Jake Williams vehicle without consent. *Id.* Plaintiff returned to her vehicle, and was ultimately notified Jake was being arrested for an OWI. *Id.* Plaintiff exited the car to ask if she was able to drive their truck home. *Id.* Plaintiff was informed the truck was to be towed. *Id.* Plaintiff returned to her vehicle and left. *Id.* At no point did the FCSD officers say anything to Plaintiff regarding her interfering or being a threat. *Id.* Suspiciously, there was no body camera footage of the incident. The officer who arrested Jake Williams and submitted a report against Plaintiff, Ryan McClain, is "potentially" related to Dumais' new boss.[12]

---

[11]Plaintiff was not asked any questions about the underlying facts of this incident during her deposition. Plaintiff cite language from her Complaint (ECF No. 1), which was previously verified through affidavit. *ECF No. 16-3,    PageID.185*

[12]Upon retirement, Dumais began employment with McClain construction in Florence, WI. *Dumais 29-30* It is unknown if his new boss is related to Ryan McClain—despite being from the small town. *Dumais 30, 178*

Dumais heard about the incident from TJ and informed Mattson. *Mattson 153* Mattson claims he "didn't hear too much" of the details and did not ask/was not told whether Plaintiff would be charged with a crime. *Mattson 153-154, 174* Mattson also spoke with FCSD Sherriff Dan Miller ("Sheriff Miller"), then submitted a request to Sheriff Dan Miller requesting the "criminal complaint" against Plaintiff and her husband, including a false statement that Plaintiff was "threatening" staff. *Exhibit 22*

On April 15, Plaintiff was handed a letter notifying her of an indefinite unpaid suspension. *Exhibit 23* Plaintiff was told by her union representative, Telling, who said Plaintiff would be terminated if she didn't resign, at which point she would lose her MCOLES certification. *Exhibit 7*

The incident with Plaintiff was discussed between officers prior to her resignation. *Hellman 86* Notably, Mattson informed the local prosecutor that Plaintiff was suspended, but still employed "at this time." *Exhibit 24*

On April 21, Plaintiff submitted her resignation in a letter stating, "you win." *Exhibit 25* During the meeting, Plaintiff read a statement outlining the discrimination against her, the sexual assaults, and the bet to sleep with her. *ECF No. 66-6,  PageID.1096-1097* Rather than investigate Plaintiff's claims, Mattson texted that they should arrange so its never discussed. *Exhibit 12* Immediately following the meeting, Mattson typed a memo documenting his perspective. Without

15

investigation, he labeled Plaintiff's statements as "slanderous lies" and that they were considering civil action against her. ***Exhibit 26***

Following the meeting, Mattson was in contact with FCSD regarding charging Plaintiff with a crime. ***Exhibit 12*** It is Plaintiff's position that Mattson continued to pressure FCD to charge and prosecute Plaintiff. On April 22, Mattson expressed excitement that Plaintiff's file was being passed on for prosecution. ***Exhibit 12*** Dumais responded that he didn't care now that Plaintiff's gone, again laughing[13]. ***Exhibit 12*** Dumais and Mattson continued texting with "updates" regarding Plaintiff's case, clearly indicating they were in consistent contact with the investigators and prosecution, including Mattson stating texting that they should "bug Forrest County" because he was "dying to know if [Plaintiff] would be charged." ***Exhibit 12*** Dumais agreed to reach out. ***Exhibit 12*** Notably, Plaintiff was not actually charged with any crime until May 10, 2022. ***Exhibit 27*** By the time of the actual charges, Mattson and Dumais had contacted FCSD and relevant prosecutors multiple times in what can be interpreted as them urging that Plaintiff be charged. Further, Mattson testified that "deep down" he might have liked that Plaintiff was charged. ***Mattson 164-165***

**<u>Defendants Continued Retaliating Against Plaintiff after her Separation</u>**

---

[13]Dumais absurdly testified the laughing emojis are not indicating anything funny, because it's not funny. ***Dumais 184-185*** His testimony on this topic is completely unpersuasive.

Defendants' retaliation against Plaintiff did not stop following her resignation. On July 13, 2022, Defendants first learned that Plaintiff filed a charge with the EEOC. *Exhibit 28* Days later, Plaintiff's months' old arrest was the top news local story, due to a tip. *Exhibit 29* It is Plaintiff's reasonable belief that Defendants notified the press in retaliation for her EEOC Charge. *Exhibit 7* Mattson/Dumais texted, laughing, that it was a good day because Plaintiff made the news. *Exhibit 12*

On July 22, 2022, Plaintiff's minor son ("HK") was charged with the alleged destruction of property, committed by a group of kids. HK was the only one charged despite evidence of comparable activity from the others present. *Exhibit 30*

In November 2022, Mattson contacted the Michigan State Police ("MSP") to report that he believed that Plaintiff's other minor child ("AK") was allegedly in possession of a handgun. *See ECF No. 1,  PageID.19; ECF No. 16-3, PageID.185*

## ARGUMENT

### I.    HOSTILE WORK ENVIRONMENT CLAIMS ARE NOT BARRED AS THEY ARE PART OF THE SAME UNLAWFUL EMPLOYMENT PRACTICE

In *Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that a "charge alleging a hostile work environment claim ... will not be time

17

barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

Plaintiff filed her charge with the EEOC on July 13, 2022. *ECF No. 1-5, PageID.42*. As to Plaintiff's hostile work environment claim, which is based in part on ongoing abuse and threatening behavior following her sexual assault by Budek, Plaintiff was pulled into a room and asked to leave the incident in the past on March 9, 2022. *Exhibit 31; ECF No. 66-4,  PageID.1070* Subsequently,  Plaintiff was subjected to continuous hostile treatment from Defendants in and out of work. As stated herein, numerous actions relating to the hostility against Plaintiff also occurred subsequent to September 16, 2021, e.g., unequal discipline, threats, bringing Plaintiff to tears. These occurrences within the statutory period draw in all other acts and abuse which constitute the hostile work environment claim that are outside the statutory period. As such, Plaintiff's claims are timely.

Importantly, Plaintiff filed her Complaint on February 13, 2023. (ECF No. 1) Defendants acknowledge that adverse actions from February 13, 2020, on are timely pursuant to ELCRA and the EPA. *ECF No. 64-1,  PageID.608* Each of Plaintiff's suspensions and her constructive discharge are timely under ELCRA and the EPA as they occurred *after* that date.

## II.   PLAINTIFF WAS DISCRIMINATED ON THE BASIS OF HER GENDER[14]

Plaintiff agrees the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies to her claims as she relies on circumstantial evidence. *ECF No. 64-1, PageID.611*. A plaintiff makes a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *White v. Baxter Healthcare Corp*., 533 F.3d 381, 391 (6th Cir. 2008).[15] It is undisputed Plaintiff is a member of a protected class as a woman. Likewise, Defendants do not question whether Plaintiff was qualified for the job and therefore waive their challenge to this element. *ECF No. 64-1,  PageID.609-610*.

### A.  *Plaintiff suffered several adverse employment decisions*

Defendants acknowledge that Plaintiff's (1) February 22, 2022, suspension, and last chance (*ECF No. 65-5, PageID.976*); (4/15/22).; and her April 15, 2022, final suspension (*ECF No. 65-10,  PageID.990*) are timely adverse employment

---

[14]The Sixth Circuit reviews Equal Protection claims under § 1983 in a similar manner as Title VII discrimination claims, and looks at Title VII precedent. *Yerkes v. Ohio State Highway Patrol,* No. 22-3030, 2022 WL 17753528, at *4 (6th Cir. Dec. 19, 2022).

actions for the purpose of all statutes. ***ECF No. 64-1, PageID.608.*** However, Plaintiff directs the Court to the following additional adverse actions:

1. <u>Constructive Discharge (all statutes)</u>

Defendants dispute that Plaintiff was constructively discharged. ***ECF No. 64-1, PageID.609.*** Plaintiff disagrees. "A constructive discharge occurs when working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." ***Tchankpa v. Ascena Retail Grp., Inc***., 951 F.3d 805, 814 (6th Cir. 2020). Defendant correctly states the elements of constructive discharge under Title VII[16].

Sufficient evidence supports a finding that Defendants deliberately created intolerable working conditions. Prior to presenting Plaintiff with her February 2022 suspension and last chance agreement (***ECF No. 65-5, PageID.976***) Dumais and Mattson discussed that Plaintiff wouldn't be around much longer. ***Exhibit 12*** Mattson further stated he told the union officer, Hal Telling, that he'd appreciate it if he communicated to Plaintiff to "start job hunting", because he can't say it himself. ***Exhibit 12*** Importantly, this dialogue occurred *before*: (1) Defendants confronting Plaintiff about Budek purportedly "coming clean" regarding her sexual assault which was characterized as "consensual" and imploring Plaintiff to move on; (2)

---

[16]The elements are comparable under ELCRA. *See **Regan v. Faurecia Automotive Seating,** Inc.*, 679 F.3d 475 (6th Cir. 2012)(ELCRA)

what Plaintiff reasonably perceives to be charged with a crime due to the insistence and pressure of Mattson and Dumais; (3) being suspended indefinitely, while having coworkers follow her to her house to recover all uniforms and IMPD property—even though there was no knowledge that she would even be charged with a crime at this point (*Mattson 155-156*); (4) being told by the union representative, whom Mattson told to tell Plaintiff to "start job hunting," that she would be terminated and lose her MCOLES licensing if she didn't resign. All of these easily support Plaintiff's resignation as a constructive discharge.

This evidence is also sufficient to create a question for the jury as to whether Defendants intended for Plaintiff to resign. Intent to discharge employee, for purposes of Title VII constructive discharge claim, can also be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. *Moore v. KUKA Welding Systems & Robot Corp*., 171 F.3d 1073 (6th Cir. 1999). Notably, Mattson even testified that it would have been his wish to terminate Plaintiff. *Mattson 170*

In *Moore*, the Sixth Circuit affirmed a jury's finding of constructive discharge because the Plaintiff felt increasingly isolated after their protected complaint. *Id.* at 1081. This was demonstrably the case for Plaintiff. Notably, the week before Plaintiff's final discipline, Mattson and Dumais were notified that Plaintiff was to

be honored for her work by the Dickinson County Prosecutor's Office, and didn't even tell her. *Exhibit 21; Mattson 149-150; Dumais 162-163*

In *Wheeler v Southland Corp.,* 875 F2d 1246 (6th Cir.1989), the Sixth Circuit found that evidence support constructive discharge, when an employee was expected to continue working with a supervisory employee who had sexually harassed them, finding that resignation was a foreseeable consequence of failure of company to deal effectively with harassment. *Id.* at 1249-1250. After being confronted about moving past her sexual assault (characterized as "consensual") so Plaintiff and Budek can work together, Plaintiff stated that she was going to consult an attorney. *ECF No. 66-5, PageID.1090* Plaintiff was targeted and constructively within weeks of this comment before she got a chance to follow up.

2. Prior discipline (EPA and ELCRA)

Plaintiff was relentlessly targeted for discipline and held to a different standard due to her gender. *Williams 168* As discussed earlier herein, each of Plaintiff's suspensions are timely under the EPA and ELCRA, which includes her initial suspensions from February 24, 2020 (*ECF No. 64-12, PageID.924*) and November 10, 2020 (*ECF No. 64-18, PageID.948*). It is undisputable suspensions are considered adverse actions.

### B.  Plaintiff was replaced by a man and also treated differently than similarly situated non-protected employees

In **Thompson v. Fresh Prod., LLC,** 985 F.3d 509 (6th Cir. 2021), this Circuit found that the fourth prong may be satisfied by demonstrating that a plaintiff was replaced by a person outside of the protected class. **Id.** at 55. Here, IMPD has hired two male officers since Plaintiff's termination, Sleeter and Petschar. **Mattson 20; Dumais 195** Thus, Plaintiff has met her *prima facie* if she has demonstrated constructive discharge.

In regard to her suspensions, Plaintiff can show she was treated different than her male coworkers. Following Plaintiff's first November 2020 suspension, Mattson sent a letter to every officer, except Plaintiff, notifying them that Plaintiff was being moved to the bottom of chain of command—despite having seniority over nearly everyone. **Exhibit 18; Hellman 62-63** This has never been done with another officer. **Mattson 113-114; Hellman 65-66** Mattson claims he did this for the "safety" of all officers. **Mattson 110** Yet, no one has ever been hurt because of Plaintiff's actions. **Mattson 114**

Plaintiff was constantly counseled about her attitude. When Dumais was crabby to Mattson, Mattson responded "it happens," minutes later Mattson states that Plaintiff needs to keep control and "not be crabby…" **Mattson 119-121**

Plaintiff received a ten day suspension for allegedly "slow rolling a car" and insubordination related to her refusal to meet with Dumais behind a closed door.

23

*Dumais 138-139* Compare this to the only other ten days suspension in known IMPD history, which was issued because officer Mike Papp legitimately threatened to shoot then chief Flaminio. *Dumais 57-58* Papp would go on to become deputy director. The only male officer fired in known IMPD memory, was Philip Bal—because he was convicted of rape. *Dumais 32-34, 58*

     C. *Discriminatory remarks viewed as direct evidence of discriminatory intent*

     Courts in this Circuit have found that "[d]iscriminatory remarks by a person who played a meaningful role in the challenged decision, or who had the ability to influence personnel decisions, are relevant direct evidence of discrimination." *Kostic v. United Parcel Serv., Inc.,* 532 F. Supp. 3d 513, 527 (M.D. Tenn. 2021). The President of the UPHT, submitted a sworn statement that Mattson explicitly told her that "women officers don't belong up here" in reference to Plaintiff. *Exhibit T* Dumais was overheard stating that Plaintiff "shouldn't have been hired and is a problem" and "a lawsuit waiting to happen." *Exhibit C* Plaintiff directs the Court to the countless other discriminatory comments referenced herein.

     D. *Equal Protection Act*

     The elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a [ ] Title VII disparate treatment claim are the same." *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917-18 (6th Cir. 2014). However, under § 1983, Plaintiff must demonstrate that she has been deprived, by

one acting under color of state law, a right secured by the Constitution or Federal laws." *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *4 (6th Cir. Dec. 19, 2022). Here, Mattson is a policymaker for Iron Mountain. *Mattson 57* Notably, Defendants assert that each Defendant were acting within their capacities as police officer to asset they are entitled to immunity. *ECF No. 64-1,  PageID.623-624.*

For the purpose of municipal liability, Defendants do not submit an argument challenging municipal liability under § 1983. *ECF No. 64-1, PageID.611-612* This is wise as a municipality can be liable under § 1983 for a failure to train its employees, where is "reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases...." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Here IMPD provided absolutely no training on sexual harassment and gender discrimination. The extent of IMPD's harassment training is handing officers a two page document from 1992. *Exhibit 33; Budek 30; Dumais 37; Hellman 25; Benjamin 21; Williams 64* Further. Mattson has made it policy that "anything goes" if it is off duty. *Mattson 71-73*.

Budek admitted to sex with a subordinate employee, including "inappropriate" touching on duty, but was never disciplined. *Budek 57-58* Mattson never even discussed with him whether he violated any policies. *Budek 60, 104* According to a former female employee of IMPD, Elizabeth Alquist, she was groped

by Dumais at a holiday party and confronted him about his inappropriate conduct. *Exhibit 34* Again, no discipline or action.

Dumais' former partner, Philip Bal, was *convicted and imprisoned* for rape, while employed with IMPD, albeit off duty, and IMPD didn't even make any internal comments or hold any subsequent trainings. ***Mattson 58-59; Dumais 33-34***

Similarly, IMPD has a "Use of Alcohol Off Duty" policy which states that "[p]ersonnel while off duty, shall refrain from consuming intoxicating beverages to the extent that it discredits the Department." *Exhibit 35* However, Mattson sees no issue with male supervisors taking IMPD shots, exchanging liquor through the mouth, with subordinate female employees. ***Mattson 71-75*** In fact, he "absolutely disagrees" this discredits the department. ***Mattson 188-189***

## III. PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED ON HER SEX[17]

A workplace is actionable under Title VII if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ***Nathan v. Great Lakes Water Auth***., 992 F.3d 557, 564-65 (6th Cir. 2021). To succeed on a hostile-work-environment sexual harassment claim,

---

[17]Courts interpret the ELCRA is interpreted using Title VII case law and, "for purposes of a hostile work environment claim, the legal standards are the same." ***Garcia v. Beaumont Health Royal Oak Hosp.,*** No. 22-1186, 2022 WL 5434558, at *3 (6th Cir. Oct. 7, 2022).

an employee must prove "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment based on her sex; (3) the harassment unreasonably interfered with her work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) the employer is liable." *Gordon v. England*, 612 F. App'x 330, 335 (6th Cir. 2015).

### a. *Plaintiff was subjected to unwelcome harassment*

There is question of fact regarding the sexual assault committed against Plaintiff by Budek, or whether it was consensual. Further, Plaintiff was subjected to the additional sexual harassment and assault outlined here, e.g., IMPD shots and consistent groping. She was ridiculed for showing emotion, for which Dumais proclaimed that he'd leave her in the fetal position. *Exhibit 12* Plaintiff was targeted with all sorts of unequal discipline. Most notably, the evidence should be considered by a jury as to whether Mattson and Dumais encouraged FCSD to charge and prosecute Plaintiff.

### b. *Plaintiff's harassment was based on her sex*

The "based on sex" requirement of a Title VII hostile work environment claim includes sexually related remarks and conduct, as well as non-sexual conduct where it evinces anti-female animus. *Ojemudia v. Rite Aid Services*, L.L.C., 540 F. Supp. 2d 855 (E.D. Mich. 2008). Further, "when a supervisor sexually harasses a

subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).

Here, Plaintiff was subjected to countless forms of harassment distinct from her male colleagues. For starters, no male colleague was required to do an IMPD shot as initiation by their supervisor. *Hellman 29, 37-38; Benjamin 26-28; Budek 42* No other officers has been issued time off besides Plaintiff since her hire. *Benjamin 18-19* On information and belief, Mattson, Dumais, and Stanchina are not joking about anyone else's spouse being a "meth head." *Exhibit 19*

c. *Severe and pervasive harassment*

"[W]hether harassment was so severe and pervasive as to constitute a hostile work environment [is] quintessentially a question of fact." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016). To succeed on this element, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Hunter v. Gen. Motors, LLC*, 807 F. App'x 540, 545 (6th Cir. 2020); *Steward v. New Chrysler*, 415 Fed. Appx. 632 (6th Cir. 2011)(ELCRA). Factors to consider in determining whether a hostile work environment exists, under the totality of circumstances, include, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

28

with an employee's work performance." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993). "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 563 (6th Cir. 1999).

In the Sixth Circuit, a single act of sexual assault, like those committed by Budak and Dumais, suffices to allege an actionable claim for creation of a sex-based hostile work environment. *See Ault v. Oberlin Coll*., 620 Fed.Appx. 395, 402 (6th Cir. 2015). Further, the Sixth Circuit reversed a district court's grant of summary judgment where the plaintiffs' evidence included not only sexually explicit comments but also acts of touching and unwelcome physical contact, finding harassment involving prior "physical invasion" is more severe than comments alone. *See Hawkins v. Anheuser–Busch, Inc*., 517 F.3d 321, 333-335 (6th Cir.2008).

The Sixth Circuit has also found isolation, characterized by similar concerted and pervasive efforts to segregate a plaintiff from the rest of the workforce, to constitute harassment supporting a hostile workplace claim. *See Waldo v. Consumers Energy Co.,* 726 F.3d 802, 815–16 (6th Cir. 2013). Here Plaintiff was forced to the bottom of seniority. Plaintiff was also frequently forced to tears, only to be lambasted, cornered, and threatened for it.

29

Again, the evidence also suggests the question of whether Mattson and Dumais encouraged and pressured FCSD and the related prosecutors to charge and prosecute Plaintiff.

d. *Employer liability*

Under Title VII, if the hostile work environment is created by a supervisor with authority over the complaining employee, the employer is vicariously liable for the hostile work environment, unless an exception applies. ***Doe v. Matthew 25, Inc***., 322 F. Supp. 3d 843 (M.D. Tenn. 2018)[18]. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable, but if the harassment does not result in a tangible employment action, the employer may escape liability by establishing an affirmative defense if they took steps to prevent and correct the harassment. *See **Wyatt v. Nissan North America, Inc.,*** 999 F.3d 400, (6th Cir. 2021).

There is no dispute Mattson is a supervisor with ability to issue discipline. ***Mattson 27*** Mattson is also a policymaker for Iron Mountain, and admits to creating a policy ***Mattson 57***  Within their interrogatories, Defendants affirmatively state that Dumais and Budek (beginning 1/6/19) were also Plaintiff's supervisors. ***Exhibit 11; Mattson 31***

---

[18]Under the ELCRA, the employer is liable for a hostile work environment "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." ***Elezovic v. Ford Motor Co***., 697 N.W.2d 851, 861 (Mich. 2005). Actual notice is not necessary; "the test is whether the employer knew or should have known of the harassment." ***Id***.

Plaintiff argues that the IMPD shot/groping by Dumais, her targeted discipline, and her the events of leading to her prosecution and constructive discharge to be discrete acts committed by her supervisors, Mattson and/or Dumais for which the employer is liable. Plaintiff also argues her sexual assaults by Budek were discrete acts, should the Court agree with Defendants' admission that he is a supervisor. If the Court disagrees, there is a question of facts as to whether Defendant knew of the incidents contemporaneously. Importantly, Mattson explicitly told Weslin that the shift change was because Budek's wife wouldn't allow him to work with Plaintiff anymore, following a known rumor about Plaintiff at Budek's house. **Exhibit 15** Regardless, Mattson didn't even investigate or punish Budek even when Plaintiff undeniably brought it to their attention.

Similarly, Plaintiff frequently stated that she was being disciplined unequally and terrified of Dumais to deaf ears, and suspension for "insubordination.

### e. Individual Defendants are liable under ELCRA

"[P]ersons to whom an employing entity delegates supervisory power and authority to act on its behalf are 'agents,' as distinguished from co-employees, subordinates, or coworkers who do not have supervisory powers or authority[.]" **Elezovic v. Bennett**, 731 N.W.2d 452, 458 (Mich. Ct. App. 2007). "If this agent is also the alleged sexual harasser, the agent is considered an employer under [ELCRA] and may be directly and individually liable for this tort against the victim, whether

31

or not the employing entity is liable." *Id.* As Director and Deputy Director of IMPD, both Mattson and Dumais had clear supervisory roles over Plaintiff. Defendants do not dispute this. *Exhibit 11*

## IV.   PLAINTIFF WAS RETALIATED AGAINST DUE TO HER PROTECTED ACTIVITY

Title VII prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII. *See 42 U.S.C. § 2000e-3(a).* To establish a *prima facie* of retaliation, Plaintiff must show:

> (1) she engaged in activity protected by [Title VII or ELCRA], (2) the exercise of her [protected conduct] was known to [Defendant], (3) [Defendant] then took an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse action.

*Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022). The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met. *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997). When an employee's supervisor directly retaliates against the employee, the employer is vicariously liable for the supervisor's unlawful actions. *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). A supervisor for the purposes of vicarious liability under Title VII is someone who "is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.,* 570 U.S. 421, 424 (2013). As Director and Deputy Director of IMPD, both Mattson and Dumais had clear supervisory roles over Plaintiff. *Exhibit 11*

a. *Plaintiff she engaged in activity protected known to Defendants*

Complaints to management and less formal protests of discriminatory employment practices are considered protected activity. *See **Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc***., 495 Fed.Appx. 651, 655 (6th Cir.2012). "[O]pposing *any* practice that the employee reasonably believes to be a violation of Title VII" constitutes protected activity. ***Johnson v. Univ. of Cincinnati***, 215 F.3d 561, 579 (6th Cir. 2000). The only restriction is that "the manner of [Plaintiff's] opposition must be reasonable." ***Id.*** at 580. Such opposition can include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." ***Id.*** Complaints or allegations that a supervisor cease harassing conduct alone constitutes a protected activity under Title VII. *See **EEOC v. New Breed Logistics***, 783 F.3d 1057, 1067 (6th Cir. 2015).

Plaintiff has numerous protected activities she can point to, beginning within her 2019 Facebook post. ***ECF No. 64-9,  PageID.904-907***. Mattson recognized this as a complaint of unequal treatment. ***Mattson 26-27*** It was perceived and discussed by officers that the post was about Plaintiff being upset with her place in the IMPD and discrimination. ***Hellman 57***; ***Budek 83***

According to Mattson, he was told by Sgt. Mike Weslin that Plaintiff may plot a civil action if she is fired, or "burn the place down. ***Mattson 51*** This could reasonably be interpreted as a protected statement of discrimination.

33

On March 10, 2022, Plaintiff notified Dumais that she was planning to consult an attorney. ***ECF No. 66-5,  PageID.1090***

Finally, Plaintiff points to her resignation statement. ***ECF No. 66-6, PageID.1096-1097.*** Mattson acknowledges that Plaintiff outlined her perceived gender discrimination during her resignation meeting. ***Mattson 170-171***

  b. *Defendants took adverse actions against Plaintiff*

Adverse actions are defined more broadly in the retaliation context than in the discrimination context. *See **Hubbell v. FedEx SmartPost, Inc**.*, 933 F.3d 558, 569 (6th Cir. 2019). Instead of demonstrating that the challenged action " 'affect[ed] the terms and conditions of employment," Plaintiff "need only show 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " ***Id.***

  1. Work related retaliation

In ***Hubbell v. FedEx SmartPost, Inc***., 933 F.3d 558 (6th Cir. 2019), the Sixth Circuit affirmed that nonstop supervision paired with constant write-ups for minor infractions was retaliation. ***Id.*** at 570. From February 2020 until her resignation, Plaintiff received several documented write ups and even suspensions for minor incidents. Further, Plaintiff was dropped the bottom of chain of

command forcing her to be supervised by everyone. *Exhibit 18* Plaintiff's final suspension has been briefed sufficiently elsewhere herein.

    2.  <u>Plaintiff was charged with a crime at the encouragement of Defendants</u>

    In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), a near unanimous Supreme Court articulated the meaning of adverse action in retaliation based on retaliatory actions taken by an employer that do not directly impact the terms and conditions of an employee's employment, provided such actions are "materially adverse" to the employee. *Id.* at 68.

    Shortly after stating that she would be speaking with an attorney regarding being approached about the previous sexual incidents with Budek, Plaintiff was arrested and charged with a crime. As noted above, Defendants were in communication with the arresting agency, FCSD, seven days before disappointed that Jake Williams would not be charged relating to a prior incident. Defendants communicated directly with FCSC numerous times before any decision was even made to charge Plaintiff. It should be for a jury to decide whether Defendant encouraged Plaintiff's prosecution or whether it's all coincidence. If Plaintiff is to be believed, Defendants' actions would dissuade any reasonable person from making future complaints.

3. Continued retaliation

Both the Supreme Court and the Sixth Circuit have recognized that former employees are protected against retaliation under Title VII. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 339 (1997) and *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 544 (6th Cir. 1993)). Looking at the situation as alleged by Plaintiff, Defendants continued to target her and her family following her separation. On July 13, 2022, Defendants first learned that Plaintiff filed a charge with the EEOC. *Exhibit H* Days later, Plaintiff's months' old arrest was the top news local story, due to a tip. *Exhibit 28* Notably, Mattson "liked" the story on Facebook, allegedly because "it was a good representation." *Exhibit 29; Mattson 165* Mattson/Dumais texted, laughing, that it was a good day because Plaintiff made the news. *Exhibit 12*

On July 22, 2022, Plaintiff's minor son ("HK") was charged with the alleged destruction of property, committed by a group of kids. HK was the only one charged despite evidence of comparable activity from the others present. *Exhibit 30*

In November 2022, Mattson contacted the Michigan State Police ("MSP") to report that he believed that Plaintiff's other minor child ("AK") was allegedly in possession of a handgun. *See ECF No. 1,  PageID.19; ECF No. 16-3, PageID.185* These actions would easily dissuade a reasonable person from making a complaint.

36

*c.  Causal connection*

Temporal proximity of mere weeks is sufficient to establish causation at the prima facie stage. ***George v. Youngstown State Univ.,*** 966 F.3d 446, 460 (6th Cir. 2020). Lengthier temporal proximity is sufficient when coupled with indica of retaliatory conduct. *See* ***Randolph v. Ohio Dep't of Youth Servs***., 453 F.3d 724, 737 (6th Cir. 2006).

Aside from a small incident, Plaintiff was not disciplined until after her Facebook post. Plaintiff was never suspended until approximately two weeks after she notified Dumais that she was afraid to meet with him one on one behind closed doors (10/27/20-11/10/20).

Plaintiff was placed on suspension and last chance around the same time Mattson was informed that Plaintiff may plot a civil action if she is fired, or "burn the place down." ***Mattson 51, 137-138***

Plaintiff was suspended and constructively discharged within a few weeks of notifying Dumais that she would be consulting a lawyer in regard to the March 9 meeting.

There is also sufficient evidence that a jury could conclude there was several indications of retaliatory conduct. When Plaintiff posted on Facebook that she felt discriminated against, Mattson held a disciplinary meeting with Plaintiff even before seeking any clarification of her post. ***Mattson 91-92***

37

When Dumais learned that Plaintiff told the union that she was afraid to talk to him, he told Mattson that "[Plaintiff] will be in the fetal position when I'm done with her." *Exhibit 12* Mattson stated, "she will not last long do you know that." *Exhibit 12* Mattson even stated he told Telling to suggest Plaintiff looking for jobs. *Exhibit 12*

Immediately, following Plaintiff's resignation statement outlining her discrimination, Mattson accused Plaintiff of slander. *ECF No. 66-6, PageID.1097.* The following day, Mattson expressed excitement that Plaintiff's file was being passed on for prosecution. *Exhibit 12* Mattson and Dumais consistently reached out to Florence County to see if Plaintiff is going to be prosecuted, including Mattson texting that they should "bug Forrest County" because he was "dying to know if [Plaintiff] would be charged." *Exhibit 12* A jury could reasonably believe Plaintiff's position that this was done in an effort to pressure Forrest County to charge and prosecute Plaintiff. Notably, Plaintiff was not actually charged with any crime until May 10, 2022. *Exhibit 27*

## V.    PRETEXT

"Pretext is a common-sense inquiry: did the employer fire the employee for the stated reason or not?" *Montell v. Diversified Clinical Services, Inc*., 757 F.3d 497, 508 (6th Cir. 2014)."[T]he issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If

so, her *prima facie* case is sufficient to support an inference of discrimination at trial." ***Id.*** To show pretext, a plaintiff must demonstrate that Defendant's proffered reason: (1) had no basis in fact; (2) did not actually motivate defendant's conduct; or (3) was insufficient to warrant the challenged conduct. ***Zambetti v. Cuyahoga Community College***, 314 F.3d 249, 258 (6th Cir. 2002).

### 1. *No basis in fact*

Plaintiffs' prima facie case plus sufficient evidence of falsity can permit the trier of fact to find discrimination. ***Sutherland v. Michigan Dep't of Treasury***, 344 F.3d 603, 615 (6th Cir. 2003), *citing* ***Reeves v. Sanderson Plumbing Products, Inc***., 520 U.S. 133, 147 (2000). Defendants largely rely on Mattson own drafted letters requesting discipline, of which the facts Plaintiff dispute. Most notably, she received her final suspension for allegedly being charged with a crime that she had not even been charged with at that point—it only came after several contacts from IMPD.

### 2. *Plaintiff's actions did not actually motivate defendant's conduct*

"Pretext may be demonstrated 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " ***Pickens v. MetalTek Int'l, Inc***., No. 15-2429, 2018 WL 6567794, at *5 (N.D. Ohio Dec. 13, 2018) (*quoting* ***Tex. Dep't of Cmty. Affs. v. Burdine***, 450 U.S. 248, 256 (1981)).

Defendants' proffered reasons are disputable through providing evidence that discriminatory animus was the true motivation driving the employer's determination. *Myers v. U.S. Cellular Corp*., 257 F. App'x 947, 954 (6th Cir. 2007). For the reasons stated throughout this brief, there is sufficient evidence that a jury could easily decide that Plaintiff's gender or protected activity could be viewed as the true motivation behind the adverse actions she faced.

      3.  *Plaintiff's conduct was insufficient to warrant the challenged conduct.*

Plaintiff was twice disciplined for swearing and/or flipping off a citizen (*written* discipline in July 2018 and a 5 day suspension in October 2020) Male officers Benjamin and Brady did similar acts without any written discipline. *Mattson 193-193* Budek doesn't dispute throwing a rage and kicking his squad car in public. *Budek 87-88; Benjamin 68-69* Hellman is aware of officers doing this without discipline too. *Hellman 69* Hellman testified to inappropriately losing it on some underage kids without discipline. *Hellman 94-95* Benjamin was once "coached" for yelling at citizens—this is important because it was unreported, Defendant learned through reviewing body cameras. *Benjamin 19-20*

In August 2019, Plaintiff received a documented conversation regarding multiple frivolous violations: (1) removing to move a car that was a biohazard due to a dead body (Plaintiff did move the car *Dumais 120*); (2) escorting an individual suffering a heart attack, potentially saving their life (there is no written policy as to

40

this *Mattson 96-98*); and (3) allegedly spending too much time at dispatch.  ECF

No. 64-1,  PageID.595 Yet, male officers frequently oversleep and are late for

shifts without discipline or documentation. *Mattson 190-191* Further, several

officers frequently napped on duty. *Budek 98; Hellman 77* Dumais and Mattson

previously texted about hiding from Plaintiff information about a sleeping officer,

who probably was "sitting in the back with his feet up watching tv." *Exhibit 12;*

*Mattson 123* Male officer also brought PBTs home to use as personal

breathalyzers, leaving officers sometimes without one when making a stop.

*Exhibit 7; Hellman 79*

Plaintiff received a five day suspension for allegedly not assisting on a call.

Comparatively, Mattson poked fun at Plaintiff being angry that she had to respond

to complaints alone. *Exhibit 20* Within her first year, Plaintiff had to answer a call

of a suicidal woman with a knife by herself while the male officers sat around.

Plaintiff was lectured for having an attitude. *Exhibit 7* Plaintiffs full response can be

found at *ECF No. 1,  PageID.12.*

November 10, 2020, Plaintiff received a seven day suspension for "slow

rolling" to a call and insubordination against Budek. As stated before, Plaintiff

completely disputes both allegations. This was the *only* time that IMPD has ever

lowered an officer in the chain of command. *Benjamin 52* Plaintiff also disputes

the final discipline involving the call from the hospital, but was told she would be fired if she didn't sign the last chance agreement. ***Exhibit 7***

The only comparable discipline from male comparators is a ten day suspension for Mike Papp for legitimately threatening to shoot the chief. ***Mattson 54*** The only male officer terminated was convicted of rape. ***Dumais 58***

## VI.   NAMED DEFENDANTS CAN BE FOUND INDIVIDUALLY LIABLE UNDER BOTH EPA AND ELCRA

ELCRA defines an "employer" as "a person who has 1 or more employees, and includes an agent of that person." MCL 37.2201(a). "[T]he Legislature intended to make the agent tantamount to the employer so that the agent unmistakably is also subject to suit along with the employer." ***Elezovic v. Ford Motor Co.,*** 472 Mich. 408, 420 (2005). Plaintiff concedes that the evidence isn't sufficient to establish individual claims against Defendant Budek. Whereas Mattson and Dumais were sufficiently involved in the discipline and relevant harassment and retaliation discussed herein.

## VII.   IIED[19]

### A.   *Immunity*

#### 1.   <u>Iron Mountain</u>

---

[19]Plaintiff concedes dismissal of IIED claim against Budek

Defendants argue for immunity under the Governmental Tort Liability Act ("GTLA"), which allows for immunity if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1). *ECF No. 64-1,  PageID.622*. "Governmental function" means "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *See **Mich. Comp. Laws § 691.1401(b).*** In determining, for immunity purposes, whether a particular activity constitutes a governmental function, focus is on the *precise activity giving rise to plaintiff's claim* rather than on the *entity's overall or principal operation*. **Everett v. Saginaw County**, 123 Mich.App. 411, 414 (1983)(*emphasis added*). Municipality can be held vicariously liable for acts of employees if activity was not governmental function within meaning of Michigan statute immunizing governmental agency from tort liability when engaged in exercise of discharge of governmental function. **Fluellen v. U.S. Dept. of Justice Drug Enforcement Admin**., 816 F.Supp. 1206, 1215-1216 (E.D.Mich.1993).

Viewing the facts most favorable to Plaintiff, Defendants Mattson and Dumais pestered a neighboring police agency influencing them to charge and prosecute the Plaintiff. Seven days prior to the arrest, Dumais communicated with this vary agency about how they weren't able to charge Jake Williams. **Exhibit 12** Although Dumais

43

downplayed it, the message was sent from Forrest County with exclamation points. ***Exhibit 12***

Despite being police officers, none of these precise activities serve a "governmental function;" rather they were clearly intended to cause emotional distress—which they did.

    2. <u>Mattson</u>

Defendants argue for similar immunity for Mattson. Under Michigan law, a governmental actor establishes qualified immunity from liability for an intentional tort by showing: (1) the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (2) *<u>the acts were undertaken in good faith, or were not undertaken with malice</u>*, and (3) the acts were discretionary, as opposed to ministerial. ***Kreipke v. Wayne State Univ***., 807 F.3d 768, 783-784 (6th Cir. 2015)(*<u>Emphasis added</u>)*; *See also* ***Courser v. Michigan House of Representatives****,* 404 F.Supp.3d 1125 (W.D.Mich.2019).

Here, Plaintiff argues that Mattson did not act in good faith, but with clear malice. The good-faith element "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." ***Odom v. Wayne Cnty***., 760 N.W.2d 217, 218 (2008). Malicious intent is defined as "conduct or a failure to act that was intended to harm

the plaintiff ... [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Id.* at 225.

The evidence provided herein demonstrates that Mattson acted with malice and bad faith in several instances towards Plaintiff. Mattson was literally thrilled that Plaintiff would be charged with a crime. This was not the first time either, Mattson once texted that he'd love to catch Plaintiff abusing sick leave—she wasn't. *Exhibit W; Mattson 116-117* The evidence is sufficient to present the question to the jury as to whether Mattson's actions were undertaken in good faith or whether he was acting with malice.

### 3. Dumais

Similar arguments can be made regarding Dumais' lack of good faith and palpable malice. Plaintiff directs the Court to the totality of arguments Plaintiff has made against Dumais herein. Dumais even became angry and retaliatory at other officers for even commenting that he was picking on Plaintiff, e.g., calling out Benjamin and disciplining him following his support of Plaintiff. *Exhibit 12; Mattson 132* There is a question of fact as to whether Dumais was malicious or capricious.

### B. Plaintiff can otherwise demonstrate Intentional Infliction of Emotional Distress

The Sixth Circuit has acknowledged the existence of this tort under Michigan law. *See Pratt v. Brown Mach. Co*., 855 F.2d 1225, 1238–39 (6th Cir.1988). To

45

establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. ***Lucas v. Awaad***, 299 Mich.App. 345, 830 N.W.2d 141, 150 (2013).

### 1. Mattson and Dumais' conduct was extreme and outrageous

To satisfy the first element of an IIED claim, "[t]he conduct complained of must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." ***Hayley v. Allstate Ins. Co.,*** 686 N.W.2d 273, 276 (Mich. Ct. App. 2004). The Court may pay particular attention to whether there is an "abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest," ***Margita v. Diamond Mortgage Corp***., 406 N.W.2d 268, 272 (1987). "[I]t is initially for the court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." ***Doe v. Mills***, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995). But "where reasonable individuals may differ," then the matter is for the jury to decide. ***Hayley***, 686 N.W.2d at 277.

When viewed most favorable to Plaintiff, and taken as a whole, Defendants conduct is so extreme and outrageous as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

2.  <u>intent or recklessness</u>

For the reasons outlined throughout this brief, it is clear that Mattson and Dumais either intended to cause Plaintiff emotional distress or otherwise did so by acting reckless.

3.  <u>Causation and severe emotional distress. '</u>

The requisite emotional distress must be "so severe that no reasonable [woman] could be expected to endure it." ***Haverbush v Powelson***, 217 Mich App 228, 235 (1996). The events have caused Plaintiff significant emotional distress, including post traumatic stress disorder. ***Exhibit 32*** No reasonable mind can argue otherwise. Plaintiff is on medication for anxiety and depression arising from her treatment. ***Williams 191***

## **CONCLUSION**

**WHEREFORE**, Plaintiff respectfully request this Honorable Court deny Defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 and grant all such further relief as shall meet equity and good conscience.

Respectfully submitted,

By:  /s/ Jack W. Schulz
Jack W. Schulz (P78078)

## <u>CERTIFICATE OF COMPLIANCE REGARDING WORD COUNT</u>

     Plaintiff, in compliance with LCivR 7.2(b)(i), used 10,798 words in her Brief in Support of their Motion for Summary Judgment. Microsoft Word Office is the word processing software used to generate the word count in the attached brief.

By:  /s/ Jack W. Schulz
Jack W. Schulz (P78078)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**TERESA WILLIAMS,**

               Plaintiff,

vs.

**CITY OF IRON MOUNTAIN,**
**IRON MOUNTAIN POLICE DEPARTMENT,**
**ED MATTSON,** in his individual and official capacities,
**JOSEPH DUMAIS,** in his individual and official capacities,
and **GARTH BUDEK,** in his individual and official capacities,
jointly and severally,

               Defendants.

Case No. 2:23-CV-00032

Hon. Hala Y. Jarbou
Mag. Judge Maarten Vermaat

_____/

| | |
|---|---|
| Jack W. Schulz (P78078) | Gregory R. Grant (P68808) |
| SCHULZ GHANNAM PLLC | Kristen L. Rewa (P73043) |
| 645 Griswold St Ste 4100 | CUMMINGS, McCLOREY, DAVIS |
| Detroit, MI, 48226 | & ACHO, P.L.C. |
| (313) 788-7446 | 310 W. Front Street, Ste. 221 |
| jack@michiganworkerlaw.com | Traverse City, MI 49684 |
| *Attorneys for Plaintiff* | (231) 922-1888/(231) 922-9888 Fax |
| | ggrant@cmda-law.com |
| | krewa@cmda-law.com |
| | *Attorneys for Defendants* |

_____/

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2024, I electronically filed the foregoing

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

with the Clerk of the Court using the ECF system which will send notification of

such filing to as counsel of record.

Respectfully submitted,

By: /s/ Jack W. Schulz
Jack W. Schulz (P78078)
SCHULZ GHANNAM PLLC
645 Griswold St. Suite 4100
Detroit, MI 48226
(313) 788-7446
jack@michiganworkerlaw.com
*Attorney for Plaintiff*

Dated:        April 15, 2024

2